UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DEMAJIO J. ELLIS,             )<br>                              )<br>        Plaintiff,            )<br>                              )<br>    v.                        )     No. 1:21-cv-02746-JMS-MG<br>                              )<br>ZATECKY Warden,               )<br>V. STANLEY,                   )<br>                              )<br>        Defendants.           )| |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Demajio Ellis filed this civil rights lawsuit alleging that he was subjected to unconstitutional conditions of confinement at Pendleton Correctional Facility ("Pendleton") due to unsafe drinking water. Defendants have filed a motion for summary judgment. Dkt. [50]. Because Mr. Ellis has introduced no evidence that the drinking water at Pendleton was unsafe during the timeframe relevant to his complaint, or that it caused his illnesses, Defendants' motion is **granted**.

**I.
Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

1

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### A. The Parties

Plaintiff Demajio Ellis is an Indiana Department of Correction inmate who is currently housed at the Correctional Industrial Facility. Dkt. 51-1 at 6. Mr. Ellis was housed at Pendleton

2

from August 2018 until February 2021 and resided in the G Cell House at Pendleton. *Id.* at 7. Mr. Ellis has no scientific or medical training. *Id.* at 18.

Defendant Vincent Stanley has been the physical plant director at Pendleton since July 2014. Dkt. 51-9 at ¶¶ 1−3. As part of his position, he oversees concerns with the water supplied to Pendleton. *Id.* at ¶ 4.

Defendant Dushan Zatecky was warden at Pendleton from March 2013 until July 2020. Dkt. 51-8 at ¶ 2. Warden Zatecky relied on Mr. Stanley to keep him apprised of any issues or concerns about the water supplied to the prison. *Id.* at ¶ 3. During his time as warden at Pendleton, Warden Zatecky does not recall ever being informed by Mr. Stanley or any governmental agency that the water at Pendleton was unsafe for drinking.[1] *Id.* at ¶ 4.

### B. The Water System at Pendleton

The water at Pendleton is supplied by Ingalls Water Company. Dkt. 51-9 at ¶ 5. The town of Ingalls contracts with Aqua Indiana ("Aqua") to maintain safe and reliable operations of the drinking water system. *Id.* at ¶ 6. Aqua operates and maintains the water plant, water mains, and hydrants. *Id.* at ¶ 7.

The water supplied by Ingalls Water Company to Pendleton is pumped to the individual housing units, including G Cell House. *Id.* at ¶ 8. All the water for Pendleton—including that used for showers and drinking—comes from the same source. *Id.* at ¶ 9. The water provided to Pendleton is disinfected and filtered through mixed media filters, which are backwashed daily. *Id.*

---

[1] The Court takes judicial notice that in December 2021, there was an outbreak of Legionnaire's Disease that was traced to the water at Pendleton. *See* Eric Graves, Fox 59, "More Legionnaires cases at Pendleton Correctional, IDOC works on plans to protect inmates and staff," https://fox59.com/news/health/more-legionnaires-cases-at-pendleton-correctional-idoc-works-on-plans-to-protect-inmates-and-staff/ (Dec. 22, 2021). The Court observes that several dozen lawsuits have been filed in this district about this outbreak, *see, e.g., Jackson, et al. v. Holcomb, et al.*, 1:21-cv-03120-JPH-KMB, but this outbreak occurred months after Mr. Ellis was transferred out of Pendleton and has nothing to do with the allegations in his case.

at ¶ 12. The water is treated with ozone, ortho/poly phosphate, and chlorine. *Id.* at ¶ 13. These levels are monitored by the town of Ingalls. *Id.* The water provided to Pendleton is also treated with a sequestering agent to prevent corrosion of the pipes through which the water runs. *Id.* at ¶ 14.

Aqua regularly tests the water supplied by Ingalls Water Company in accordance with the Indiana Department of Environmental Management standardized monitoring framework. *Id.* at ¶ 10. If there are any issues with the water quality at Pendleton, Mr. Stanley relies on the advice of Aqua. *Id.* at ¶ 11. The water provided to Pendleton meets all federal, state, and local requirements for potable water. *Id.* at ¶ 15.

### C. Mr. Ellis' Illnesses and Complaints Related to the Water

At the time of his deposition in November 2022, Mr. Ellis was using inhalers, pain medication, nasal spray, and nitro medication which had been prescribed for him due to his asthma, back pain, and chest pain. Dkt. 51-1 at 7, 9–11. Mr. Ellis had previously been prescribed psychotropic medications for his mental health diagnoses of depression, anxiety, PTSD, and bipolar disorder, but he had stopped using these medications because he felt that they were not working. *Id.* at 11–13.

Mr. Ellis alleged in his complaint that the water at Pendleton is "contaminated" with lead and other chemicals including "high levels of alpha, and beta radiation, 'cyanide' and perfloroalky and polyfuoroalkyl substances." Dkt. 1 at 3. During his deposition, Mr. Ellis stated he did not know what alpha, beta radiation, or cyanide were, nor did he know what high levels of these materials were. Dkt. 51-1 at 31–36. His determination of what was in the water was "at least one percent [based on a] guess that it was in the water." *Id.* at 36. Mr. Ellis suspected that perfluoroalkyl and

polyfluoroalkyl substances were in the water based on something he saw in the news. *Id.* at 37. Mr. Ellis knew that the water was contaminated based on his personal observations, stating:

> I used to have like lead metal pieces in my water. You know, rusted little pieces sink to the bottom and like little black mold spots floating in the water and the water smelling like mildew and rotten eggs and yellowish, dark orange color water and … sometimes strong smells of bleach, taste of chlorine.

Dkt. 51-1 at 30.

On February 13, 2020, Mr. Ellis wrote a grievance describing his observations of the water and his perception that the water was contaminated with the chemicals described above. Dkt. 51-6. Mr. Stanley responded to the grievance on February 25 based on his personal knowledge about the water provided to Pendleton and its treatment. Dkt. 51-9 at ¶ 17; dkt. 51-7. Mr. Stanley explained that the water at Pendleton does not contain levels of lead, alpha radiation, beta radiation, cyanide or perfluoroalkyl or polyfluoroalkyl substances above the safety thresholds set by the federal, state, and local governments. Dkt. 51-9 at ¶ 18; dkt. 51-7 at 1.

When there is a concern about the water at Pendleton, specific testing is ordered. Dkt. 51-9 at ¶ 19. In March and April 2020, testing was done on the water boilers to ensure proper functioning which came back normal. *Id.* at ¶ 20, p. 4−5 (testing reports). An August 2021 test for perfluoroalkyl or polyfluoroalkyl showed that both were below detection level. *Id.* at ¶ 21. A September 2021 test for coliform came back negative. *Id.* at ¶ 22, pp. 6−7 (testing reports).

Mr. Ellis reported to medical staff his concerns that the water in the G Cell House was causing various maladies, including stomach upset, diarrhea, organ damage, and painful urination. Dkt. 54-2 at 1−2, 8, 10−13. No medical professional at Pendleton attributed Mr. Ellis' mental or physical health issues to the drinking water at Pendleton. Dkt. 51-1 at 49. The medical records that Mr. Ellis introduced indicate that medical staff heard his concerns that his symptoms were caused by the water, but they do not indicate any belief by medical staff that the water actually caused

5

Mr. Ellis' illnesses.[2] *See* dkt. 54-2. Indeed, one response to a healthcare request form stated, "We have no signs of black mold [in the water]. This issue has been addressed." *Id.* at 12.

## III.
## Discussion

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind, i.e., that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. The right to have access to safe drinking water is clearly established, and the lack of access to safe drinking water may constitute an unconstitutional condition of confinement. *Hardeman v. Curry*, 933 F.3d 816, 820 (7th Cir. 2019).

Mr. Ellis' claim fails on the objective component. That is, Mr. Ellis has produced no evidence to support his contention that the drinking water in G Cell House was unsafe during the time he resided there. Mr. Ellis testified that he saw contaminants in the water in the form of tiny metal pieces and discoloration. Dkt. 51-1 at 30. But he has produced no evidence showing what

---

[2] Mr. Ellis testified that Dr. Talbot advised him in 2019 to heat the water before he consumed it or to purchase water from commissary, dkt. 51-1 at 41, and he alleged in his response in opposition to the defendants' motion for summary judgment that both Dr. Talbot and Dr. Knieser told him "that since [he] had been drinking 'lead' in the water for months or longer that it could cause [him] to suffer future harm," dkt. 54 at 2. These statements are inadmissible hearsay and cannot be considered by the Court as evidence. *MMG Fin. Corp. v. Midwest Amusements Parks, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) ("A party may not rely on inadmissible hearsay to avoid summary judgment.").

those contaminants were, or that they caused the water to be unsafe to consume. The defendants' evidence shows that the water at Pendleton was tested, and those tests indicated that the water was safe to drink and that any chemical detected was within a permissible level under federal and state guidelines. Dkt. 51-9 at ¶¶ 10, 18−22. Although Mr. Ellis introduced medical records, those only showed that *he* believed the water was making him sick. Dkt. 54-2. Nothing in the records indicates that any medical professional was concerned about the water's safety. *Id.*

Further, Mr. Ellis' claim fails on the subjective component. There is no evidence that either Mr. Stanley or Warden Zatecky knew of and disregarded a risk that Mr. Ellis was drinking unsafe water. *Thomas*, 2 F. 4th at 720. Warden Zatecky relied on Mr. Stanley to report issues related to the water at Pendleton, and he could not recall any instance where a concern about the safety of the water was raised while he was the warden there. Dkt. 51-8 at ¶ 4. Mr. Ellis filed a grievance expressing his concern about the safety of the water. Dkt. 51-6. Mr. Stanley responded to the grievance by reporting that the amounts of chemicals listed by Mr. Ellis in his grievance were within acceptable limits or not detected in the water. Dkt. 51-9 at ¶ 18; dkt. 51-7 at 1.

Because the undisputed evidence fails to create a triable issue of material fact, Defendants' motion for summary judgment must be **granted**.

## IV.
## Conclusion

Defendants' motion for summary judgment is **granted**. Dkt. [50]. Final judgment will issue in a separate entry.

**IT IS SO ORDERED.**

Date: 8/7/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

DEMAJIO J. ELLIS
166596
PENDLETON - CORRECTIONAL INDUSTRIAL FACILITY
CORRECTIONAL INDUSTRIAL FACILITY
Electronic Service Participant – Court Only

Katherine A Meltzer
Office of Indiana Attorney General
katherine.meltzer@atg.in.gov

Julie Tront
Office of Indiana Attorney General
julie.tront@atg.in.gov